UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

ROBERT S.,[1]

        Plaintiff,

    v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

        Defendant.

Case No. 3:21-cv-01716-YY

OPINION AND ORDER

YOU, Magistrate Judge.

    Plaintiff Robert S. seeks judicial review of the final decision by the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33. This court has jurisdiction to review the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g). For the reasons set forth below, that decision is REVERSED and REMANDED for further proceedings consistent with this decision.

## STANDARD OF REVIEW

    The reviewing court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. 42 U.S.C.

---

[1] In the interest of privacy, the court uses only plaintiff's first name and the first initial of plaintiff's last name.

1 – OPINION AND ORDER

§ 405(g); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007). This court must weigh the evidence that supports and detracts from the ALJ's conclusion and "'may not affirm simply by isolating a specific quantum of supporting evidence.'" *Garrison v. Colvin*, 759 F.3d 995, 1009-10 (9th Cir. 2014) (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)). This court may not substitute its judgment for that of the Commissioner when the evidence can reasonably support either affirming or reversing the decision. *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Instead, where the evidence is susceptible to more than one rational interpretation, the Commissioner's decision must be upheld if it is "supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted); *see also Lingenfelter*, 504 F.3d at 1035.

## SEQUENTIAL ANALYSIS AND ALJ FINDINGS

Disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. § 416.920; *Lounsburry v. Barnhart*, 468 F.3d 1111, 1114 (9th Cir. 2006) (discussing *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999)).

At step one, the ALJ found plaintiff had not engaged in substantial gainful activity since his alleged onset date of February 1, 2016, through his date last insured, December 31, 2020. At step two, the ALJ determined plaintiff suffered from the following severe impairments: post-traumatic stress disorder ("PTSD"); major depressive disorder; personality disorder; narcolepsy;

left shoulder impingement syndrome; right shoulder tendinosis/bursitis; epilepsy; and right cubital tunnel syndrome (20 CFR 404.1520(c)).

At step three, the ALJ found plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. The ALJ next assessed plaintiff's residual functional capacity ("RFC") and determined he has the "capacity to perform light work as defined in 20 CFR 404.1567(b), except he can never climb ladders, ropes, or scaffolds but can occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl. He can never reach overhead with the bilateral upper extremities. He can frequently handle with the right dominant upper extremity. He can tolerate no exposure to hazards such as unprotected heights and heavy mechanical machinery (like a jackhammer, tractor, or open water). He must be able to wear sunglasses. He can perform work that needs some skills but does not require doing the more complex work duties. He can persist at tasks that can be learned in up to three months on the job. He can sustain ordinary routines, understand, carry out, and remember instructions and use judgment in making work-related decisions. He can attend and concentrate for two-hour periods totaling a normal eight-hour workday, with usual work breaks. He can maintain persistence and pace. He can respond appropriately to supervision, co-workers and usual work situations. He can tolerate occasional interaction with supervisors and co-workers but should not have to engage in any teamwork or collaboration with co-workers. He can tolerate no interaction with the general public. He can adapt to occasional changes in a routine work setting. He can perform low-stress work, which is defined as work requiring at most occasional decisions and occasional changes in work duties and tasks. He can work at a consistent pace throughout the workday but not at a production-rate pace where each task must be completed within a strict time

deadline. He must avoid work environments with public crowds such as restaurants, theaters, and retail stores."

At step four, the ALJ found plaintiff was unable to perform any past relevant work. However, considering plaintiff's age, education, work experience, and RFC, the ALJ concluded there were jobs that existed in significant numbers in the national economy that plaintiff could perform, including laundry classifier, routing clerk, and garment sorter. Thus, the ALJ concluded plaintiff was not disabled.

## DISCUSSION

### I. Narcolepsy

When a claimant has medically documented impairments that could reasonably be affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996) (citation omitted). A general assertion that the claimant is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible." *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993). The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (internal citation omitted). The ALJ need not "perform a line-by-line exegesis of the claimant's testimony" or "draft dissertations when denying benefits." *Lambert v. Saul*, 980 F.3d 1266, 1277 (9th Cir. 2020). But Ninth Circuit law "plainly requires" that an ALJ do more than "offer[ ] non-specific conclusions that [the claimant's] testimony [is] inconsistent with [certain evidence]." *Id.* (citations omitted). If the "ALJ's credibility finding is supported by substantial evidence in the record, [the court] may not

engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002) (citation omitted).

In evaluating a claimant's subjective symptom testimony, an ALJ may consider whether it is consistent with objective medical evidence. 20 C.F.R. §§ 404.1529(c)(1)-(3), 416.929(c)(1)-(3); SSR 16-3p, *available at* 2017 WL 5180304, at *7-8. The lack of objective medical evidence may not form the sole basis for discounting a claimant's testimony. *Tammy S. v. Comm'r Soc. Sec. Admin.*, No. 6:17-cv-01562-HZ, 2018 WL 5924505, at *4 (D. Or. Nov. 10, 2018) (citing *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("[T]he Commissioner may not discredit [a] claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.")). However, when coupled with another permissible reason, inconsistencies between a claimant's allegations and objective medical evidence may be used to discount a claimant's testimony. *Tatyana K. v. Berryhill*, No. 3:17-cv-01816-AC, 2019 WL 464965, at *4 (D. Or. Feb. 6, 2019) (citing *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1197-98 (9th Cir. 2004)).

Effective March 28, 2016, the Commissioner superseded Social Security Ruling ("SSR") 96-7p, governing the assessment of a claimant's "credibility," and replaced it with SSR 16-3p. *See* SSR 16-3p, *available at* 2016 WL 1119029. SSR 16-3p eliminates the reference to "credibility," clarifies that "subjective symptom evaluation is not an examination of an individual's character," and requires the ALJ to consider all the evidence in an individual's record when evaluating the intensity and persistence of symptoms. *Id.* at *1-2. The ALJ must examine "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and

5 – OPINION AND ORDER

other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4.

Plaintiff contends the ALJ erred in discounting his subjective symptom testimony regarding narcolepsy and failing to properly account for it in the RFC.  The record shows that plaintiff has a long history of narcolepsy symptoms.[2]  Medical records from 2018 described plaintiff as a 35-year-old Navy veteran who suffered traumatic brain injuries in 2013 and 2014 off the coast of Somalia while in service.  Tr. 1193.

> The claimant reports that he was on a Navy ship in the Persian Gulf that was invaded by ocean pirates from Somalia. He says that he was shot at and then thrown into a sleeping bunk sustaining head trauma. He says that following that, he developed problems with PTSD, narcolepsy and insomnia.

Tr. 1242.  Even before that, plaintiff began experiencing narcolepsy symptoms as early as 19 to 20 years old when he was in A School.  Tr. 1181.  Plaintiff would fall asleep in class, but "was somehow able to stay in the military for 14 years."  *Id.*  Due to his narcolepsy, plaintiff has "nearly fallen asleep driving" and "has had episodes of driving and not recalling the drive home."[3]  *Id.*  Plaintiff also "has fallen asleep in an upright position," Tr. 1242, and "has had sleepwalking episodes."  Tr. 1181.

---

[2] "Narcolepsy has been determined to be the statutory equivalent of the listed impairment of epilepsy."  *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987); *see Stone v. Saul*, No. 2:18-CV-02862 CKD, 2020 WL 1332946, at *2 (E.D. Cal. Mar. 23, 2020) (describing narcolepsy is "a sleep disorder that causes extreme sleepiness and uncontrollable sleep attacks, making a person fall asleep at inappropriate times during the day") (citing Harvard Medical Dictionary of Health Terms, https://www.health.harvard.edu/medical-dictionary-of-health-terms/j-through-p#N-terms); POMS DI 24580.005(B) (describing that "sleep symptoms will range from mild drowsiness to severe sleepiness in which the individuals spend the entire day drifting in and out of sleep, unable to work, play or supervise the home, and that "[t]he sensation is described as ordinary but uncontrollable drowsiness").

[3] Plaintiff "forfeited his driver's license."  Tr. 1243.

6 – OPINION AND ORDER

Plaintiff contends that his testimony before the ALJ described how his "narcolepsy impairment causes excessive sleeping, followed by a fugue state," and "[w]hen these symptoms occur, they effectively preclude [his] capacity to work at the rate of 3-5 times a week for several hours each time, and at unforeseeable times." Pl. Br. 13. Plaintiff asserts these "statements establish work preclusion limitations, but the ALJ provided no explanation why this testimony was disregarded." *Id.*

The ALJ observed that plaintiff claimed the following narcolepsy symptoms and limitations:

- Plaintiff cannot drive due to narcolepsy and epilepsy, has limited mobility, and fatigues easily.
- He has no warning for narcolepsy episodes and has been described during such episodes as acting like a "drunk child."
- He experiences narcolepsy three to five times a week on average, but he is currently experiencing it five to seven times a week because he is stressed from being in the process of moving.
- Plaintiff described that his narcoleptic episodes last 30 minutes to three hours and he may experience a fugue states until the next day with stuttering.
- Plaintiff was not taking any medications to help control his symptoms of narcolepsy or epilepsy because the side effects were worse than he anticipated and he was acting out in his sleep.

The ALJ discounted plaintiff's claimed symptoms because they were "inconsistent with the medical and other evidence." Tr. 21. The ALJ relied on objective medical evidence to discount plaintiff's subjective symptom testimony, specifically, a "normal" MRI in October 2016, Tr. 22 (citing Ex. 2F/49), "[r]epeat brain imaging [that] remained unremarkable," as well as "72-hour EEG testing" in 2018, *id.* (citing Exs. 6F/2 (May 2018 MRA and EEG); 17F/66-67, 18F/6-12 (MRA and EEG results). However, as the Social Security Administration itself has recognized, "[t]here are no physical abnormalities in narcolepsy, and with the exception of sleep studies, laboratory studies will be normal." POMS DI 24580.005(B). "It is not necessary to

obtain an electroencephalogram (EEG) in narcolepsy cases," and "[a] routine EEG is usually normal[.]" POMS DI 24580.005(C). Plaintiff's narcolepsy diagnosis was confirmed by a MSLT sleep study in 2018. Tr. 1486 ("MSLT was positive for narcolepsy"); Tr. 1489 (recognizing diagnosis of narcolepsy made through MSLT); Tr. 1490 ("PSG and MSLT . . . support a diagnosis of narcolepsy"); Tr. 1811 (describing four seizures during overnight sleep study). Moreover, the medical records document the associated presence of cataplexy, which "is ordinarily sufficient to establish narcolepsy, without laboratory studies." POMS DI 24580.005(B).

Nevertheless, the lack of objective medical evidence cannot be the sole reason to discount a claimant's symptom testimony. The ALJ observed that "it does not appear the claimant has sought much if any treatment, as he refused medication and did not follow up with providers after his 2018 testing." Tr. 22 (citing Ex. 17F/66-67). But plaintiff in fact sought treatment after his May 2018 MRA and EEG. For instance, neurology chart notes from December 2018 describe plaintiff reporting that he "will often fall asleep without warning, at least 3-5 times a week, sometimes daily," and his symptoms increased with stress. Tr. 1181; *see also* Tr. 1187 (chart notes from July 2018); Tr. 1185 (chart notes from October 2018). In September 2019, the Department of Veterans Affairs granted a service connection for narcolepsy with an evaluation of 20 percent (which was later increased to 40% in November 2019, Tr. 349), based on private and VA treatment records from 2018 and 2019. Tr. 331. In January 2020, plaintiff requested a follow up with a neurologist to address his narcolepsy. Tr. 1810. In September 2020, plaintiff reported that "[o]ver the past many months, [his] current symptoms include rapid onset of sleep and sleep attacks in the afternoon." Tr. 1486; Tr. 1739 (chart notes

from December 2020 describing the same); Tr. 1767 (November 2020 chart notes describing "almost daily narcolepsy episodes").

Also, the ALJ ignored that, in a March 2020 chart note, plaintiff described "chronic concerns with narcolepsy, which historically has been treated by a community provider," but "this case was abruptly discontinued [when] the 'choice program went away,'" and plaintiff was "unable to re-establish care with these providers due to financial issues." Tr. 1795. "Disability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds." *Gamble v. Chater,* 68 F.3d 319, 321 (9th Cir. 1995).

Plaintiff reported experiencing cataplexy since 2015. Tr. 1181. He even suffered one episode while receiving a haircut. Plaintiff's cataplexy is also related to stress. During cataplexy episodes, plaintiff will become limp and cannot move, and there are "times where he can't move when he is sitting still." *Id.* The ALJ cited the infrequency of plaintiff's cataplexic episodes to show that, while plaintiff's "condition has not entirely resolved, . . . it appears to be infrequent based on the available medical evidence." Tr. 22. But the ALJ failed to account for the fact that plaintiff continued to suffer from other narcolepsy symptoms, including chronic and frequent sleep attacks. The ALJ tried to incorporate plaintiff's narcolepsy into the RFC by including a prohibition on "climbing ladders, ropes, or scaffolds and prohibition on exposure to hazards accounts for this condition." Tr. 25. The ALJ also stated that plaintiff's symptoms of "epilepsy/narcolepsy (Ex. 22F/232; 6F/13; 20F/21) are consistent with the handling and hazard limitations as well." *Id.* However, this does not take into account plaintiff's frequent and regularly occurring "sleep attacks" and the "fugue state that happens afterwards." Tr. 53. During the fugue state, which "lasts anywhere between 15 minutes to eight to ten hours or even into the next morning," plaintiff becomes "very confused," has trouble placing where he is, fails

9 – OPINION AND ORDER

to recognize people around him, cannot talk straight, stutters, cannot move, and "even dozed off." Tr. 53-54. Plaintiff claims he has been unable to work even a very simple job, and when he "dozed off" at work during a break, his "boss . . . told him to go home." Tr. 54

Finally, the ALJ erred in discounting plaintiff's testimony on the basis that he refused to take medication. Plaintiff testified that he stopped taking medication because he was "acting out in my sleep." Tr. 52. Specifically, plaintiff recounted, "I was molesting my wife unconsciously in my sleep. I would touch her, grab her, things like that and it was not conducive for us and so we made a decision to pull me off." Tr. 52. Also, plaintiff declined Modafinil in September 2020 due to a history of substance abuse. Tr. 1486. And sodium oxybate (Xyrem) was "not approved by [the] pharmacy." Tr. 1739.

For these reasons, the ALJ erred in evaluating plaintiff's subjective symptom testimony regarding his narcolepsy.

## II.  Step Two—Irritable Bowel Syndrome

Plaintiff claims the ALJ erred in failing to include irritable bowel syndrome ("IBS") at step two.

At step two, the ALJ determines whether the claimant has any medically determinable impairments that are "severe." The step two inquiry is "a *de minimus* screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Yuckert*, 482 U.S. at 153–54). A severe impairment is one that significantly impairs the claimant's ability to perform basic work activities for at least 12 months. *See* 20 C.F.R. §§ 404.1509; 404.1520(a)(4)(ii). Step two impairments "may be found not severe *only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual's ability to work.*" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (citation and

internal quotation marks omitted) (emphasis in original); *see also* SSR 85-28, 1985 WL 56856, at *3 (Jan. 1, 1985). Step two findings must be based upon medical evidence. 20 C.F.R. §§ 404.1520(a), 416.920(a). The ALJ may draw inferences about the severity of an impairment based on the degree of treatment the claimant sought. *Flaten v. Sec'y of Health & Hum. Servs.*, 44 F.3d 1453, 1464 (9th Cir. 1995). "Omissions at step two are harmless if the ALJ's subsequent evaluation considered the effect of the impairment omitted at step two." *Harrison v. Astrue*, No. 10–6120–MO, 2011 WL 2619504, at *7 (D. Or. July 1, 2011) (citing *Lewis*, 498 F.3d at 911).

The ALJ recognized that plaintiff claimed he had "problems with IBS," including "needing to use the bathroom three to four times in two hours" and being "unable to leave the house during that time." Tr. 21. The ALJ noted that plaintiff "detailed that in his security job, he had IBS and he was using the bathroom sixteen times per day prior to the date last insured." *Id.* The ALJ found that IBS was non-severe at step two because "there is no significant treatment concerning this condition," "[t]he claimant testified that he was never prescribed medication for it and only used over the counter medication," "dietary changes had been helpful," and "[t]he lack of treatment records pertaining to this impairment indicates that it is not as limiting as alleged." Tr. 15-16. Elsewhere in the decision, the ALJ observed that plaintiff "has only tried taking over the counter medication and a prescribed antacid." Tr. 21.

At the hearing, plaintiff testified that, in 2020, he used the bathroom six to eight times a day and was currently using it four to six times a day. Tr. 57-58. He described that sometimes he has to use the bathroom three to four times in the first two hours that he is up; therefore, he "can't really get anywhere effectively," and if he "was to try the public transit system, . . . it takes way too long" and he "run[s] the risk of having an accident" due to his IBS. Tr. 56-57.

Plaintiff explained he needed ready access to a restroom or he would have an accident.  Tr. 57.  Plaintiff explained that he has tried over-the-counter antacids and even prescription antacids, but "[t]hey didn't really do much for" him.  Tr. 58.  He noticed a "downtrend a little bit" after changing his diet.  *Id.*  However, on bad days, which he has three to five times a month, he is "stuck in the bathroom or in bed curled up in the fetal position because [his] stomach was in so much pain that [he] couldn't get up unless it was to go to the bathroom."  Tr. 58.

Medical records reflect that plaintiff meets the Rome criteria for an IBS diagnosis.  Tr. 778.  Plaintiff reported suffering constipation every day and diarrhea every other day.  Tr. 1575.  He also reported abdominal pain, and could not tell if it improved with bowel movements.  Tr. 1113, 1578.  Plaintiff found that when he avoided gluten, it "helps his bowel habits."  Tr. 1092; Tr. 1116 (chart notes indicating plaintiff's IBS is "[b]etter if follows gluten free diet"); Tr. 1557 ("pt has eliminated gluten, which has helped").  "[D]airy can also be a trigger."  Tr. 1345.  Plaintiff has been advised to "add fiber and active culture" to his diet.  Tr. 1094.  Chart notes from April 2020 indicate plaintiff's IBS was "fairly well controlled on diet."  Tr. 1810.  Plaintiff was prescribed dicyclomine (Bentyl), 20 mg, three times per day before meals.  Tr. 369, 1151, 1920.

The ALJ's decision is internally inconsistent.  The ALJ recognized that plaintiff had used a prescribed medication for IBS, Tr. 21, but ultimately concluded that plaintiff's IBS was non-severe because he was never prescribed medication for it.  Tr. 15.  Records show plaintiff in fact was prescribed Bentyl for his IBS and had tried using it.  Tr. 369, 1113, 1151, 1920.

The ALJ also discounted plaintiff's IBS because there had been no "significant treatment' for it and dietary changes had been helpful.  But, as noted, plaintiff was prescribed medication for IBS.  He also saw providers multiple times (*e.g.*, August 2015, Tr. 1113, March 2016, Tr.

1094, May 2020, Tr. 1574, June 2020, Tr. 1343) in an effort to seek relief for his IBS symptoms, which included abdominal pain and diarrhea. Tr. 1580. Also, although plaintiff reported that his symptoms were "better" and "fairly well controlled" with diet, he still reported that he had to use the bathroom multiple times per day or else he would have an accident, and that his bathroom use was more frequent in the morning when he would have to use public transportation to get to work (because his narcolepsy prevents him from driving).

In sum, there is error in the ALJ's evaluation of plaintiff's IBS at step two, and the error is not harmless because the ALJ did not consider the effects of plaintiff's IBS in the RFC. On remand, the ALJ shall reevaluate whether plaintiff's IBS is severe at step two.

### III. Credit-As-True Analysis

When a court determines the Commissioner erred in some respect in making a decision to deny benefits, the court may affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for a rehearing." *Treichler v. Commissioner of Social Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (quoting 42 U.S.C. § 405(g)). In determining whether to remand for further proceedings or immediate payment of benefits, the Ninth Circuit employs the "credit-as-true" standard when the following requisites are met: (1) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, (2) the record has been fully developed and further proceedings would serve no useful purpose, and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the plaintiff disabled on remand. *Garrison*, 759 F.3d at 1020. Even if all of the requisites are met, however, the court may still remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled[.]" *Id*. at 1021.

Here, the first requisite of the *Garrison* test is met. As discussed above, the ALJ improperly rejected plaintiff's subjective symptom testimony. However, it is not clear the remaining requisite factors have been established. There is no listing for narcolepsy. The agency's internal guidance indicates that, "when evaluating medical severity, the closest listing to equate narcolepsy with is Listing 11.02, Epilepsy." POMS DI 24580.005(C). The ALJ did not reach this issue, and the parties did not address it. Therefore, this case is remanded for the ALJ to properly assess plaintiff's subjective symptom testimony and conduct whatever additional proceedings and analysis are necessary to determine whether plaintiff is disabled due to his narcolepsy. The ALJ shall also reassess whether plaintiff's IBS is severe at step two.

## ORDER

The Commissioner's decision is REVERSED and REMANDED for further proceedings consistent with this decision.

DATED March 20, 2023.

/s/ Youlee Yim You<br>
Youlee Yim You<br>
United States Magistrate Judge